**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

Ancillary Case No: ______________________

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

BRENT SEAMAN, ACCANITO EQUITY, LLC; ACCANITO EQUITY II, LLC; ACCANITO EQUITY III, LLC; ACCANITO EQUITY IV, LLC; ACCANITO CAPITAL GROUP, LLC; ACCANITO HOLDINGS, LLC; SURGE, LLC

Defendants.
_____________________________________/

Case No. 23-cv-22791-KMW (S.D. Fla.)

MELANIE E. DAMIAN, as Receiver of ACCANITO EQUITY, LLC; ACCANITO EQUITY II, LLC; ACCANITO EQUITY III, LLC; ACCANITO EQUITY IV, LLC; ACCANITO CAPITAL GROUP, LLC; ACCANITO HOLDINGS, LLC; SURGE, LLC

Plaintiff,

v.

THEODORE L. STAUB, III, individually; ANGELA D. DENEASE, individually; ANTHONY M. LAWHON, P.A., a Florida corporation; MONTGOMERY STREET REALTY, LLC, a Florida limited liability company,

Defendants.
_____________________________________/

# <u>COMPLAINT</u>

Melanie E. Damian, the court-appointed receiver ("Receiver") for the Receivership Entities in the above-captioned Securities and Exchange Commission ("SEC") enforcement action ("SEC Enforcement Action"),[1] sues Theodore L. Staub, III, an individual, Angela D. Denease, f/k/a Angela D. Seaman, an individual, Anthony M. Lawhon, P.A., a Florida corporation, and Montgomery Street Realty, LLC, a Florida limited liability company (collectively, "Defendants").

## I. OVERVIEW

1. Brent Seaman, a professional "confidence man," convicted federal felon, and twice bankrupt debtor moved his family from Carmel, Indiana to Naples, Florida, and set up and ran a Ponzi scheme from about June 2019 until September 2022, through his businesses, the Accanito Entities and Surge. Brent Seaman told his investors that his companies provided "safe" investments, "guaranteed" returns between 18% and 48%, and that he would only use investor funds to trade commodities and currencies, and to invest in start-up technology and software companies. Unfortunately for his investors, Brent Seaman's claims were false, he was running a Ponzi scheme, and he was brazenly enriching himself and his family with investor money.

[1] The Receiver was appointed receiver for the following entities controlled by Brent A. Seaman and used in his Ponzi scheme: Accanito Capital Group, LLC ("Accanito Capital"), Accanito Accanito Equity, LLC, Accanito Equity II, LLC, Accanito Equity, III, LLC, Accanito Equity IV, LLC, (all collectively the "Accanito Entities") and Surge, LLC ("Surge"). The Receiver sometimes refers to the Accanito Entities and Surge together as the "Receivership Entities".

2. Brent Seaman and his family, to make themselves seem legitimate and to burnish and perpetuate the Ponzi scheme, put up a façade of integrity, faith, acumen, and affluence. They were frequent guests at high-priced events and galas, flaunted the luxury vehicles they drove, rented multi-million-dollar residential estates, travelled on private jets and helicopters, and vacationed at extravagant resorts. But, as it turns out, the Seamans' outward image of wealth and prestige was all fake and funded through fraud and ill-gotten gains at the expense of Brent Seaman's Ponzi scheme's investor victims.

3. By the fall of 2022, when the Ponzi scheme collapsed, approximately 60 investors had invested approximately $35 million with Brent Seaman and the Receivership Entities, most of whom were Brent Seaman's fellow Naples community members and Grow Church congregants.

4. In July 2023, the SEC filed suit against Brent Seaman and his entities. The court presiding over the SEC Enforcement Action subsequently appointed the Receiver on October 27, 2023 to marshal and collect assets for distribution to investors, with the goal of mitigating investor losses. The court also empowered the Receiver to bring lawsuits to recover fraudulently diverted investor money.

5. The Receiver, in this ancillary action, pursuant to her court-appointed duties, sues five defendants, who are: (i) Brent Seaman's long term, sophisticated investor and trusted business associate, Theodore L Staub, III, the largest "net

winner" who received $353,391.32 in "false profits"; (ii) Brent Seaman's ex-wife, Angela D. Denease, recipient of $341,063.65 of investor funds; (iii) Brent Seaman's personal lawyer's law firm, Anthony M. Lawhon, P.A., recipient of $44,500.00 of investor funds; and (iv) Montgomery Street Realty, LLC, recipient of $445,334.00 of investor funds, and the owner of the multi-million dollar luxury residential estate in which the Seamans lived for a year at the expense of investors.

6. The Receiver sues each of the four defendants: (i) to avoid and recover actual fraudulent transfers under Chapter 726 of the Florida Statutes, Florida's version of the Uniform Fraudulent Transfer Act, Fla. Stat. §§ 726.101, *et seq.* ("FUFTA"); (ii) to avoid and recover constructive fraudulent transfers, also under FUFTA; and (iii) for unjust enrichment under Florida common law.

## II. PARTIES, JURISDICTION, VENUE, CONDITIONS PRECEDENT

### A. Parties

7. Plaintiff, the Receiver, is the court-appointed receiver of the Receivership Entities and brings this lawsuit in that capacity, in all of its facets.

8. Defendant, Theodore L. Staub, III, is a resident of Naples, Collier County, Florida, which is within the Middle District of Florida, and is over 18-years old.

9. Defendant, Angela D. Denease f/k/a Angela D. Seaman, is a resident of Collier County, Florida, which is within the within the Middle District of Florida, and is over 18-years old.

10. Defendant, Anthony M. Lawhon, P.A., is a Florida corporation, with its principal place of business in Naples, Collier County, Florida, which is within the Middle District of Florida.

11. Defendant, Montgomery Street Realty, LLC, is a Florida limited liability company, with its principal place of business in Naples, Collier County, Florida, which is within the within the Middle District of Florida.

**B. Subject Matter and Personal Jurisdiction**

12. This Court has subject-matter jurisdiction over the state-law claims asserted in this complaint in this ancillary proceeding pursuant to 28 U.S.C. § 1367 because those claims are ancillary to the SEC Enforcement Action brought in the case captioned *SEC v. Seaman*, Case No. 23-cv-22791-KMW (S.D. Fla.), over which the court in the Southern District of Florida has jurisdiction pursuant to 28 U.S.C. § 1331.

13. Defendant, Theodore L. Straub, III, is subject to this Court's personal jurisdiction because he is a Florida resident, and he resides in the Middle District of Florida.

14. Defendant, Angela D. Denease, is subject to this Court's personal jurisdiction because she is a Florida resident, and she resides in the Middle District of Florida.

15. Defendant, Anthony M. Lawhon, P.A., is subject to this Court's personal jurisdiction because it is a Florida corporation, with a principal place of business in Naples, Collier County, Florida, and it conducts business within the Middle District of Florida.

16. Defendant, Montgomery Street Realty, LLC, is subject to this Court's personal jurisdiction because it is a Florida limited liability company, with a principal place of business in Naples, Collier County, Florida, and it conducts business within the Middle District of Florida.

17. Defendants are also subject to this Court's personal jurisdiction because they received funds from the Receivership Entities in this district and Brent Seaman was operating his Ponzi scheme through the Receivership Entities in this district.

**C. Venue**

18. Venue is proper in this district pursuant to 28 U.S.C. § 754, 1692 because all of the Defendants either reside or have their principal place of business in this District.

19. Venue is also proper in this district because the transfers at issue in this case were made from and to accounts owned by individuals or entities within this district and those transfers harmed the Ponzi-scheme victims in this district.

**D. Conditions Precedent**

20. All conditions precedent to the bringing of this action have been performed, waived, satisfied, or have occurred.

## III. GENERAL FACTUAL AND PROCEDURAL BACKGROUND

### A. Brent Seaman and His Checkered Past

21. Brent Seaman is a convicted felon.

22. In 2001, Brent Seaman was charge by the United States Attorney for the Southern District of Indiana for wire fraud (18 U.S.C. § 1343) in the case styled *USA v. Seaman*, Case No. 00-cr-00102-SHD-KPF (S.D. Ind.) ("Federal Criminal Case") relating to his property flipping scheme, which is believed to have involved double closing with straw buyers involving 38 sales and loans obtained in a two-month period in 1997.

23. Brent Seaman, in the Federal Criminal Case, was sentenced to 17 months of federal imprisonment ("Federal Imprisonment"), 3 years supervised release, and $940,000.00 in restitution.

24. Brent Seaman has filed bankruptcy twice, with his first bankruptcy case in 1999 in the United States Bankruptcy Court in the Southern District of

Indiana, with the case styled *In re Seaman*, Case No. 99-06861-FJO-7 (Bankr. S.D. Ind.) ("1999 Indiana Bankruptcy").

25. Brent Seaman is believed to have moved from Carmel, Indiana to Naples, Florida in 2009 to escape the approximately $10 million in financial carnage he wreaked in Indiana through Sales Diesel, LLC and Lead Works, LLC.

26. Brent Seaman filed his second bankruptcy case in 2014 bankruptcy filed in the United States Bankruptcy Court for the Middle District of Florida, with the case styled *In re Seaman*, Case No. 14-bk-08868-FMD (Bankr. M.D. Fla.) ("2014 Florida Bankruptcy").

27. Brent Seaman, in his 2014 Florida Bankruptcy discharged approximately $10 million in debt related to what is believed-to-be another fraudulent scheme he perpetrated in Indiana through entities called Lead Works, LLC and Sales Diesel, LLC. *In re Seaman*, Case No. 14-bk-08868-FMD (Bankr. M.D. Fla.) (ECF No. 1).

28. Brent Seaman also has substantial tax liens against him in Collier County, Florida for the years 2010 to 2017 in the aggregate amount of $595,752.58. *See* Instr. # 5691201, OR 5612, PG 3881, Recorded on April 1, 2019 for the 2016 and 2017 Tax Years totaling $95,544.35; Instr. 5370751, OR 5365, PG 2116, Recorded on February 23, 2027 for the 2010 to 2015 Tax Years totaling $500,208.23.

29. Unfortunately, Brent Seaman looked to Grow Church in Naples, Florida to perpetrate the instant Ponzi scheme.

30. As discussed in more detail below, Brent Seaman, through the Receivership Entities, raised approximately $35 million from about 60 investors from June 2019 until September 2022 before the SEC sued him and his entities and put an end to his Naples, Florida based Ponzi scheme.

**B. The SEC Enforcement Action**

31. On July 27, 2023, the SEC filed its complaint against Brent Seaman and his entities for violations of federal securities laws ("SEC Complaint") in the South District of Florida, which initiated the SEC Enforcement Action, *SEC v. Seaman,* Case No. 23-cv-22791-KMW.

32. The SEC sought an asset freeze and appointment of a receiver, which the court granted as unopposed. *See* SEC Enforcement Action ECF Nos. 4, 5, 17, 18.

33. The SEC sought and obtained consents for entry of judgment against Brent Seaman, and the Receivership Defendants. *See* SEC Enforcement Action ECF Nos. 6, 43, 44, 45, 46, 47, 48, 49, 50.

**C. The Receiver's Appointment**

34. On October 27, 2024, the court presiding over the SEC Enforcement Action entered the *Order Appointing Receiver* (the "Appointment Order"), in which

it appointed the Receiver over the Receivership Entities. *See* SEC Enforcement Action ECF No.18.

35. The Receiver, pursuant to the Appointment Order, is authorized to "to sue for and collect, recover, receive and take into possession from third parties all Receivership Property." *See* Appointment Order at p. 3.

36. The Receiver brings this ancillary action to fulfill her obligations under the Appointment Order.

37. The Appointment Order created a receivership estate compromised of all the assets of the Receivership Entities and all assets the Receiver recovers on behalf of the Receivership Defendants' investors ("Receivership Estate").

38. By virtue of the Receiver's appointment, the Receivership Entities were "cleansed" through the receivership, as Brent Seaman was ousted, and the Receivership Entities are now under the Receiver's control subject to oversight by the court presiding over the SEC Enforcement Action.

## IV. BASIS FOR THE RECEIVER'S CLAIMS FOR RELIEF

### A. The Seaman/Accanito Entities/Surge Ponzi Scheme

39. The Receiver's and her professionals' analysis of the Receivership Entities' books and records, including banking records, revealed that Brent Seaman operated a Ponzi scheme through the Receivership Entities from at least June 2019 until September 2022 ("Ponzi Scheme Period").

40. During the Ponzi Scheme Period, Brent Seaman was not registered with the SEC, the Commodity Futures Trading Commission ("CFTC"), the Financial Industry Regulatory Authority ("FINRA"), or any other regulatory body or agency.

41. During the Ponzi Scheme Period, Brent Seaman was not registered as a broker-dealer nor was he associated and acting under the supervision of a registered broker-dealer when he solicited the Accanito Entities' investors.

42. As part of his pitch, it is believed that Brent Seaman told his Ponzi scheme investors that he was a successful investor, the investors would invest money in the Receivership Entities, he would then invest their money in start-up companies and make profitable trades in commodities and currencies.

43. Brent Seaman touted his supposed (but completely untrue) 25 years of running successful business and that he was on "an assignment from a higher power".

44. To lure investors in, Brent Seaman promised his investors annual returns ranging between 18% and 48%.

45. Brent Seaman perpetrated his fraud through in-person meetings, providing investors marketing materials, and espousing the safety of the investments.

46. To effectuate the fraud, Brent Seaman structured investments with terms ranging between 12 to 18 months, with an option to renew upon completion of the term.

47. The investor's investment was memorialized by a certificate of membership issued in certain of the Accanito Entities.

48. Those investors who obtained certificates of membership interests in certain of the Accanito Entities also were asked to sign amendments to the corresponding entities operating agreement that permitted Brent Seaman to invest their money in Surge or Accanito Capital Group, which Brent Seaman solely owned and controlled.

49. Brent Seaman transferred most of the investors' funds to bank accounts titled in Surge's name.

50. Brent Seaman personally raised most of the funds solicited from investors.

51. The Receiver's and her professionals' analyses of the Receivership Entities' books and records, including banking records, revealed Brent Seaman, through the Receivership Entities, ran a phony investment plan in which monies paid by later investors were used to pay artificially high returns to the initial investors, with the goal of attracting more investors.

52. For example, Surge's books and records reflect that Surge had a closed book net loss at year-end 2019 and had an aggregate net loss of over $20 million from the start of 2019 to when the SEC commenced the SEC Enforcement Action.

53. Brent Seaman's *modus operandi* was to use newly invested money to pay off old investors and convince the investors that they are earning profits.

54. Brent Seaman ran his Ponzi scheme by using the Accanito Entities as the investment vehicles and Surge as the money funnel.

55. Brent Seaman directed most investors to send their money to Surge at its bank account at BMO Harris Bank.

56. Brent Seaman used Surge's account to, among other things, enrich himself and his family, pay false profits to investors, and make improper payments to third parties solely for his benefit and not for the benefit of the investors who transferred money into Surge's account.

57. Ultimately, the Receiver's and her professionals' investigations into Brent Seaman's Ponzi scheme perpetrated through the Receivership Entities, and their review of the books, records, and banking account documents of the Receivership Entities showed:

a. deposits were made by investors;

b. the Receivership Entities conducted little or no legitimate business;

c. the purported business operations of the Receivership Entities produced little or no profits or earnings; and

d. the source of the payments to investors was cash infused by new investors.

58. As part of the Ponzi scheme, Brent Seaman exercised dominion and control over Surge and directed or executed fraudulent transfers out of Surge's account at BMO Harris Bank.

59. Brent Seaman ceased making distributions in November 2022.

**B. The Receiver's Standing for FUFTA Claims and Unjust Enrichment Claims**

60. Brent Seaman used the Receivership Entities to comingle and siphon invested funds without the knowledge and permission of investors, used the Receivership Entities' funds to pay "false profits" to certain investors harming the "net loser" investors, and used the Receivership Entities' funds to pay his and his family's personal expenses, for which the Receivership Entities received no benefit, and which also harmed investors.

61. Brent Seaman harmed the Receivership Entities when he used investor funds for an unauthorized purpose and fraudulently diverted Receivership Entities' funds to the Defendants in this ancillary proceeding.

62. The Receivership Entities were injured by Brent Seaman's transfers to Defendants in this ancillary proceeding, as the money transferred to Defendants was not available to pay the Receivership Entities' claims as creditors.

63. The Receivership Entities were also victims of the fraud and are tort creditors of Brent Seaman and his Ponzi scheme.

64. The Receivership Entities were injured separately and apart from the injury to the Ponzi scheme investors.

65. The Receivership Entities are different from the pre-receivership entities, as they are managed by different individuals for different purposes and are governed by different rules.

66. The Receiver, on behalf of the Receivership Estate and the Receivership Entities, which are "creditors," as defined in section 726.102 of FUFTA, of the pre-receivership entities controlled by Brent Seaman, has standing to bring the fraudulent transfer claims asserted in this Complaint under the FUFTA.

67. The Receiver, on behalf of the "newly cleansed" Receivership Entities has standing to asserted fraudulent transfer claims under FUFTA and unjust enrichment claims under Florida common law because she could assert claims against the "evil zombie" pre-receivership Accanito Entities and Surge that wrongfully dissipated investor funds from the Receivership Entities.

68. The Receiver, the Receivership Estate, and the Receivership Entities are each creditors of Brent Seaman and pre-receivership Accanito Entities and Surge.

69. The transfers to Defendants at issue in this action removed assets from Surge for an unauthorized purpose and by doing so injured Surge.

70. The Receiver was appointed to maximize the value of the Receivership Estate by, among other things, seeking to recover corporate assets unlawfully dissipated by Brent Seaman, which includes the transfers to Defendants at issue in this action.

71. The Receiver is now in control of the Receivership Entities and her appointment removed Brent Seaman's control over the Receivership Entities.

72. Pursuant to applicable case law, the Receiver has standing to bring the fraudulent transfer and unjust enrichment claims asserted in this complaint, seeking to redress the wrongs that Brent Seaman committed against the Receivership Entities by making the fraudulent transfers and improper and unjust payments to and for the benefit of Defendants. *See Wiand v. ATC Brokers Ltd.*, No. 22-13658, 2024 U.S. App. LEXIS (11th Cir. March 19, 2024); *Wiand v. Lee*, 753 F. 3d 1194, 1202 (11th Cir. 2014).

### A. The Receiver's Bank Reconstruction Analysis and the Receivership Entities' Insolvency

73. Brent Seaman utilized BMO Harris Bank as his primary banking institution from which to operate his Ponzi scheme.

74. The Receiver obtained the bank account records from the Receivership Entities' bank accounts at BMO Harris Bank.

75. The Receiver and her team reviewed the books and records of the Surge and determined that Surge was insolvent from June 2019 to September 2022, Brent Seaman suffered massive trading losses using the investor funds deposited into Surge's account, and Brent Seaman used new investors' funds deposited in Surge's accounts to pay existing investors.

76. The Receivership Entities were insolvent from inception and became increasingly insolvent as the scheme progressed.

### B. "Net-Gain/False Profits" Analysis

77. The Receiver and her professionals conducted a "net gain/false profits" analysis to determine who of the Ponzi scheme investors were "net winners."

78. This analysis looked at the amount of money each investor invested in the Ponzi scheme and how much that investor received back from the Ponzi scheme.

79. Investors that received back more than they invested were deemed "net winners" as they received "false profits" because the Ponzi scheme paid existing investors with new investor money, not actual investment gains or profits.

80. The Receiver seeks to avoid and recover net gains/false profits from Theodore L. Staub, III, a "net winner" in this Action.

**C. Improper Payment Analysis**

81. The Receiver and her professionals conducted an analysis of improper payments that provided no benefit to the Receivership Entities that Brent Seaman caused the Receivership Entities to make using investors' money to benefit himself and his family.

82. When Brent Seaman took investor money from the Receivership Entities and paid his personal expenses using the investor money in the Receivership Entities, that action harmed investors because the Ponzi scheme was not a legitimate business and only had cash through new investor money and always was running a deficit with an outstanding balance due to investors and insufficient funds to pay that balance.

83. The improper payments the Receiver discovered included payments Brent Seaman caused Surge to make for Brent Seaman's and his family's personal expenses, such as Brent Seamans's personal attorney's bills owed to Lawhon in the amount of $44,500.00; Brent Seaman's personal obligations to his ex-wife, Denease,

in the amount of $341,063.65; and Brent Seaman's and his family's luxury residential rental property, owned by Montgomery, in the amount of $445,334.00.

84. These improper payments harmed the Receivership Entities because they diverted Surge's funds to Denease, Lawhon, and Montgomery, in exchange for no benefit or value from them to Surge.

**D. The Limitations Period**

85. Section 726.110 of FUFTA provides a four-year period to seek to avoid and recover transfers from the date the transfer was made or, if later, within one year after the transfer was or could reasonably have been discovered by the claimant.

86. The court presiding over the SEC Enforcement Action appointed the Receiver on October 27, 2024 so that is the earliest possible date she could have discovered the transfers made to Defendants in this action.

87. The Receiver brings this action on October 25, 2024, within one year from the date of her appointment, so all of the transfers she seeks to avoid and recover as actual fraudulent transfers under section 726.105(1)(a) of FUFTA from Defendants are properly brought within one year of her appointment.

88. The Receiver also seeks to avoid and recover constructive fraudulent transfers under section 726.105(1)(b) of FUFTA that were made to Defendants

within the four-year period prior to the date upon which the Receiver filed this Complaint.

89. The Receiver seeks damages for unjust enrichment under Florida common law for the transfers made to Defendants within the four-year period prior the date upon which the Receiver filed this Complaint.

## V. FACTUAL BACKGROUND PERTINENT TO DEFENDANTS AND THE TRANSFERS SUBJECT TO AVOIDANCE AND RECOVERY

### A. Theodore L. Staub, III and the Staub False Profit Transfers

90. Theodore L. Staub, III is an educated, sophisticated engineer and statistician.

91. Staub has achieved master's degrees in industrial engineering, operations research, and statistics. He has also completed a doctoral course in statistics.

92. During the Ponzi Scheme Period, Brent Seaman and Staub developed a close personal relationship and Staub became involved in the operations of the Receivership Entities, including Surge.

93. Any involvement Staub had with Brent Seaman and the Receivership Entities, including Surge, only served to further and perpetuate the Ponzi scheme as an illegal and fraudulent enterprise harming the Receivership Entities and innocent investors.

94. During the Ponzi Scheme Period, Staub was one of Brent Seaman's trusted associates, who was privy to the inner workings of Seaman's and the Receivership Entities' operations, at one point even working for Brent Seaman out of one of Seaman's companies' offices.

95. Staub, as a former business associate and confidant of Brent Seaman, is an insider for FUFTA purposes.

96. The Receiver's and her team's investigation to date revealed that Staub received from his business associate's Ponzi scheme $353,391.32 from Surge that constitutes "false profits" or "net gain" ("Staub False Profit Transfers").

97. The Receiver attaches as ***Exhibit A*** a transfer schedule showing the dates and amounts of the Staub False Profit Transfers.

98. When the transfers among Surge and Staub are reconciled, they show that Staub is a "net winner."

99. During the Ponzi Scheme Period, Staub was a "net winner."

100. Staub had access to Brent Seaman and the Receivership Entities and information about their operations that other investors did not have.

101. Brent Seaman reposed trust and confidence in Staub that he did not place in other investors.

102. Brent Seaman offered business opportunities to Staub that he did not offer to other investors.

103. Staub was willfully ignorant and turned a blind eye to what he knew or should have known was a Ponzi scheme in exchange for false profits or net gains in the amount of $353,391.32.

104. During the Ponzi Scheme Period, Staub was aware of "red flags" that would have led a reasonable investor to inquire into some aspects of Brent Seaman's operations of the Receivership Entities, including Surge.

105. Staub received the Staub False Profit Transfers from the funds of other investors in the Receivership Entities, including Surge.

106. Staub received the Staub False Profit Transfers while Seaman was operating the Receivership Entities, including Surge, as a Ponzi scheme.

107. Staub received the Staub False Profit Transfers while the Receivership Entities, including Surge, were insolvent.

108. Staub was unjustly enriched through the Staub False Profit Transfers he received from Surge because the money he received was the money of other investors and not money generated through legitimate trades or business operations.

**B. Angela D. Denease f/k/a Angela D. Seaman and the Denease Transfers**

109. Denease is Brent Seamans's ex-wife.

110. Denease is an insider for FUFTA purposes by virtue of her multi-year marriage to Brent Seaman.

111. Denease and Brent Seaman were married on March 5, 1994 in Indianapolis, Indiana and divorced on March 7, 2017 in Naples, Florida.

112. Denease was married to Brent Seaman while Brent Seaman was subject to the Federal Criminal Case and Federal Imprisonment.

113. Denease was married to Brent Seaman during the years for which the federal tax liens are filed against Brent Seaman.

114. Denease was married to Brent Seaman when he filed his First Bankruptcy Case and his Second Bankruptcy Case.

115. Denease was aware of the existence of Receivership Entity Surge prior to her divorce from Brent Seaman.

116. Denease was vocal about her views on Brent Seaman's immoral character, and broadcast those views openly to third parties, which resulted in Brent Seaman filing two civil lawsuits against her seeking, among other things, preliminary and permanent injunctive relief against her to stop her from sharing the knowledge she had gathered about Brent Seaman over the course of their 23-year marriage.

117. During the course of their 23-year marriage and through the financial disclosures exchanged in their divorce, Denease became aware of Brent Seaman's financial condition and business operations, including certain facts about the Accanito Entities and Surge.

118. The Receiver's and her team's investigation to date revealed that Denease received $341,063.65 in transfers from Surge's BMO Harris Bank account between June 28, 2019 and August 26, 2022 ("Denease Transfers").

119. The Receiver attaches as ***Exhibit B*** a transfer schedule showing the dates and amounts of the Denease Transfers.

120. From June 28, 2019 to August 26, 2022, Surge's BMO Harris Bank account was funded solely with money from investors in Brent Seaman's Ponzi scheme so Denease received investor funds in the amount of $341,063.65.

121. Denease did not have an ownership interest in Surge.

122. Denease did not have any contractual or legal relationship with Surge.

123. Denease was not an employee of Surge.

124. Denease did not loan money to Surge.

125. Denease did not invest money in Surge.

126. Denease did not provide services to Surge.

127. Denease did not provide goods to Surge.

128. Denease had no legal right to receive $341,063.65 from Surge.

129. Denease was a stranger to Surge.

130. Denease could not have sought to enforce any obligations against Surge.

131. Denease could not have sued Surge to collect any debts because Surge owed her no debts.

132. Denease received the Denease Transfers when she had no legal right or entitlement to receive any transfers of money from Surge.

133. Denease received the Denease Transfers from the funds of investors who transferred money to Surge at Brent Seaman's direction.

134. Denease received the Denease Transfers while Brent Seaman was operating a Ponzi scheme and Surge was a part of that Ponzi scheme.

135. Denease received the Denease Transfers while Surge was under Brent Seaman's domination and control.

136. Denease received the Denease Transfers while Surge was insolvent.

137. Denease has no entitlement to receive transfers from the proceeds of Brent Seaman's fraud.

138. Surge received no consideration for the money Denease received from Surge.

139. All of the funds that Denease received from Surge were tainted by Brent Seaman's Ponzi scheme and fraud.

140. The Receiver's tracing of investor funds revealed that all of the Denease Transfers came from investor funds deposited into Surge's BMO Harris Bank account.

141. Denease is not a bona fide recipient of the Denease Transfers for value.

142. Denease was unjustly enriched through the Denease Transfers she received from Surge because the money she received was the money of investors and not money belonging to Brent Seaman or that he generated through legitimate trades or business operations.

**C. Anthony M. Lawhon, P.A. and the Lawhon Transfers**

143. The Receiver's and her team's investigation to date reveal that Lawhon received $44,500.00 in transfers from Surge when it had no legal right or entitlement to receive any payments from Surge ("Lawhon Transfers").

144. The Receiver attaches as ***Exhibit C*** a transfer schedule showing the dates and amounts of the Lawhon Transfers.

145. Lawhon acted as Brent Seaman's personal attorney.

146. Lawhon represented Brent Seaman for a brief time in a case in which Brent Seaman had sued Denease for, among other things, violating a non-disclosure agreement Brent Seaman and Denease had signed prior to their divorce.

147. Through Lawhon's review of the statements Denease made about Brent Seaman, Lawhon was placed on notice of Brent Seaman's federal felony conviction for wire fraud.

148. Lawhon withdrew from representing Brent Seaman in the case Brent Seaman had filed against Denease prior to the ultimate disposition of that case.

149. Lawhon never provided legal services to Surge.

150. Surge was never a client of Lawhon.

151. Lawhon knew that it received funds from Surge even though Surge was not its client.

152. Lawhon did not conduct any investigation into the reason that it was receiving funds from Surge instead of its client Brent Seaman.

153. Lawhon was willfully ignorant and turned a blind eye to the fact that it received funds from an entity (Surge) that was not its client.

154. Lawhon received investor funds in the amount of $44,500 from Surge.

155. Lawhon received transfers from Surge between August 2020 and September 2021, which is within the Ponzi Scheme Period.

156. Lawhon had no legal right to receive $44.500.00 from Surge.

157. Surge was a complete stranger to Lawhon.

158. Lawhon could not have sought to enforce any obligations against Surge.

159. Lawhon could not have sued Surge to collect any debts because Surge owed it no debts.

160. Lawhon received the Lawhon Transfers while Surge was insolvent.

161. It is customary in the legal industry for an attorney or a law firm to make an inquiry into the source of a payment from or on behalf of a client.

162. It is believed that Lawhon failed to follow routine business practices when it received $44,500 from Surge, when Surge was not his client.

163. Lawhon was unjustly enriched through the Lawhon Transfers it received from Surge because the money it received was the money of investors and not money belonging to Brent Seaman or that he generated through legitimate trades or business operations.

**D. Montgomery Street Realty, LLC and the Montgomery Transfers**

164. The Receiver's and her team's investigation to date revealed that Montgomery received $445,334.00 in transfers from Surge when it had no legal right or entitlement to receive any payments from Surge ("Montgomery Transfers").

165. The Receiver attaches as ***Exhibit D*** a transfer schedule showing the dates and amounts of the Montgomery Transfers.

166. Montgomery owns an impressive luxury residential real estate portfolio with at least 13 properties located in Collier County, Florida.

167. Montgomery's Naples, Florida luxury residential portfolio contains several luxury residential homes.

168. One luxury residential property in Montgomery's remarkable portfolio is the 2017-2019 remodeled, luxury residential estate located at 740 Banyan, Naples, Florida 34012 ("740 Banyan Estate").

169. The Collier County, Florida Property Appraiser lists the 2024 market value of the 740 Banyan Estate as $8,987,078.00.

170. The 740 Banyan Estate is located in the exclusive, and one of Naples, Florida's most coveted communities, Coquina Sands.

171. The 740 Banyan Estate is less than a mile from the beach.

172. The 740 Banyan Estate is 5,395 square feet, situated on a 0.66-acre lot, with 6 bedrooms, 6 1/2 bathrooms, a true-to-size lap pool, and a three-car garage.

173. The 740 Banyan Estate also boasts an outdoor kitchen, fireplace, fire pit, and white oak flooring.

174. Montgomery rents the 740 Banyan Estate to wealthy or seemingly wealthy individuals for residential purposes on a yearly basis payable in one lump sum payment in cash.

175. The 740 Bayan Estate is currently available for rent at $630,000 annually, which equates to $52,500 monthly.

176. Despite being a residential landlord, when it came to Brent Seaman and his wife Jana Seaman, it is believed that Montgomery did not conduct background checks or request financial information about the Seamans.

177. When it came to Brent and Jana Seaman, it is believed that Montgomery forwent the usual informational diligence practices such as background and financial wherewithal checks that is customary to residential landlords.

178. Upon information and belief, Montgomery did no due diligence concerning Brent and Jana Seaman.

179. Montgomery received a lump sum of $445,334.00 from Surge even though it had no right to received any money from Surge.

180. Montgomery made clear that the 740 Banyan Estate was for *residential purposes only* so the relationship between Brent and Jana Seaman was not a commercial relationship.

181. Montgomery received $445,334.00 investor money from Surge despite the fact that Montgomery had no business dealings with Surge and provided absolutely no value to Surge.

182. It is customary in the residential leasing industry for the owner of a property intended to be leased to an individual for residential purposes to conduct a background check concerning the occupants of the residential property prior to occupancy.

183. Had Montgomery conducted a industry standard background investigation into Brent Seaman it would have discovered the following facts

demonstrating the avoidability and recoverability of the Montgomery Transfers or at a minimum the need to conduct further investigation into Brent Seaman and the $445,334.00 it received from Surge: (i) Brent Seaman's federal criminal conviction and 17-month stint in federal prison for felony wire fraud: (ii) Brent Seaman's $940,000.00 restitution penalty with which he was sanctioned for his federal felony crime; (iii) Brent Seaman's 1999 bankruptcy and 2014 Chapter 7 bankruptcy in which Brent Seaman discharged approximately $10 million in debt he owed relating to what is believed to be his Sales Diesel/Lead Works scam; (iv) Brent Seaman's recorded federal tax liens for the years 2010 to 2017 in the aggregate amount of $595,752.58, and (v) the 2018 lawsuit filed by Brent Seaman's and Jana Seaman's landlord for the luxury home they rented located at 537 Moring Line Drive, Naples, Florida 34102, in which the landlord there alleged Brent Seaman and Jana Seaman missed several rental payments, failed to pay the required liquidated damages, and failed to pay the required utilities.

184. Montgomery did not conduct any form of background check on Brent Seaman prior to accepting the $445,334.00 it received from Surge.

185. Montgomery did not ask for any documents verifying the corporate authority or propriety of Surge transferring $445,334.00 to Montgomery when Montgomery had no business dealings with Surge.

186. Montgomery took no steps to determine why Surge was paying $445,334.00 to Montgomery when the 740 Banyan Estate could not be used for business purposes.

187. Montgomery simply accepted $445,334.00 of investor money from Surge without providing anything at all to Surge in return.

188. Montogomery chose to accept $445,334.00 from Surge without taking any steps to verify the legitimacy of the transfer of the $445,334.00 from Surge.

189. Montogomery chose to ignore readily accessible facts that would have revealed the numerous red flags associated with accepting $445,334.00 from Surge.

190. Montgomery failed to follow routine business practices when it accepted the $445,334.00 from Surge.

191. Montgomery was willfully ignorant and turned a blind eye to the fact that it received funds from an entity, Surge, with which it had no business dealings or justification for receiving $445,334.00.

192. Montgomery had no legal right to receive $445,334.00 from Surge.

193. Surge was a complete stranger to Montgomery.

194. Montgomery could not have sought to enforce any obligations against Surge.

195. Montgomery could not have sued Surge to collect any debts because Surge owed it no debts.

196. Montgomery received the Montgomery Transfers from the funds of investors in Surge.

197. Montgomery received the Montgomery Transfers while Brent Seaman was operating Surge as a Ponzi scheme.

198. Montgomery received the Montgomery Transfers while Surge was insolvent.

199. Montgomery received the Montgomery Transfers during the Ponzi Scheme Period.

200. Montgomery was unjustly enriched through the Montgomery Transfers it received from Surge because the money it received was the money of investors and not money belonging to the Seamans or that they generated through legitimate trades or business operations.

## VI. CLAIMS FOR RELIEF

### COUNT I — ACTUAL FRAUDULENT TRANSFERS PURSUANT TO FLA. STAT. §§ 726.105(1)(A), 108(1), 109(2)

***(Receiver v. Staub)***

201. The Receiver sues Theodore L. Staub, III, and adopts, realleges, and incorporates paragraphs 1 through 108 into Count I.

202. As detailed above, the Receiver has standing to avoid and recover under FUFTA the Staub False Profit Transfers Brent Seaman caused the Surge to make to Staub.

203. Brent Seaman caused Surge to make the Staub False Profit Transfers to Staub in continuing breach of his fiduciary duty to Surge and as part of his adverse domination and control of Surge, which constituted torts against Surge.

204. Brent Seaman caused Surge to make the Staub False Profit Transfers to Staub in furtherance and as part of the Ponzi scheme.

205. With each of the Staub False Profit Transfers, Brent Seaman diverted Surge's funds, which he controlled and that could have been applicable to Surge's debts due.

206. The Staub False Profit Transfers constituted payments of artificially high returns to an initial or insider investor from later investor monies with the goal of attracting more investors.

207. The Staub False Profit Transfers represent the amount of money Staub received from the Ponzi scheme in excess of the amount of money he invested in the Ponzi scheme.

208. Because the Ponzi scheme suffered investment losses and was funded by new investors, Staub provided no value to the Receivership Entities beyond his principal investments.

209. Brent Seaman caused Surge to make the Staub False Profit Transfers to Staub with the actual intent to hinder, delay, or defraud creditors.

210. The actual intent to hinder, delay, or defraud a creditor is demonstrated by the presence of, including, but not limited to, the following "badges of fraud" under section 726.105(2) of FUFTA:

a. Brent Seaman caused Surge to make the Staub False Profit Transfers to Staub, who is an insider (Brent Seaman's former business associate and confidant);

b. the Staub False Profit Transfers were concealed;

c. Staub provided no value in exchange for the Staub False Profit Transfers;

d. Brent Seaman caused Surge to make the Staub False Profit Transfers to Staub while the Receivership Entities were insolvent; and

e. Brent Seaman caused Surge to make the Staub False Profit Transfers to Staub while the Receivership Entities were incurring substantial debt by accepting to new investors into the Ponzi scheme.

211. At all times when Brent Seaman caused Surge to make the Staub False Profit Transfers to Staub, the Receivership Entities were:

a. in a financial position in which their debts were greater than all of their assets at fair valuation; and/or;

b. generally not paying their debts as they became due.

212. The Staub False Profit Transfers constituted transfers of the Ponzi scheme investors' money to Staub.

213. As a direct and proximate result of the Staub False Profit Transfers, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $353,391.32 (the total amount of the "false profits" he received), and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by Brent Seaman and the Receivership Entities.

214. The Receiver is suing to avoid and recover the Staub False Profit Transfers within one year of the date upon which she was appointed (October 27, 2023), which is within the time period proscribed by section 726.110 of FUFTA.

215. The Staub False Profit Transfers are avoidable and recoverable by the Receiver under FUFTA, including sections 726.105(1)(a), 108(1), and 109(2).

WHEREFORE, the Receiver respectfully requests the Court enter a judgment in the Receiver's favor against Theodore L. Staub, III:

A. Avoiding the Staub False Profit Transfers as actual fraudulent transfers under sections 726.105(1)(a), 108(1) of FUFTA;

B. Awarding a money judgment in the amount of the Staub False Profit Transfers under section 726.109(2) of FUFTA;

C. If necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to the Staub False Profit Transfers in the amount of the Staub False Profit Transfers under section 726.108(1) of FUFTA;

D. Awarding pre-judgment interest on the Staub False Profit Transfers as provided by applicable law;

E. Awarding post-judgment interest on the Staub False Profit Transfers as provided by applicable law;

F. Awarding costs as provided by applicable law; and

G. Granting any other relief that is available under applicable law that the circumstances may require.

**COUNT II—CONSTRUCTIVE FRAUDULENT TRANSFERS**
**PURSUANT TO FLA. STAT. §§ 726.105(1)(B), 726.106(1), 108(1), 109(2)**

***(Receiver v. Staub)***

216. The Receiver sues Theordore L. Staub, III and adopts, realleges, and incorporates paragraphs 1 through 108 into Count II.

217. As detailed above, the Receiver has standing to avoid and recover under FUFTA the Staub False Profit Transfers Brent Seaman caused the Surge to make to Staub.

218. Brent Seaman caused Surge to make the Staub False Profit Transfers to Staub in continuing breach of his fiduciary duty to Surge and as part of his adverse domination and control of Surge, which constituted torts against Surge.

219. Brent Seaman caused Surge to make the Staub False Profit Transfers to Staub without receiving reasonably equivalent value from Staub in exchange for the Staub False Profit Transfers, because, among other things, the Staub False Profit Transfers constitute "net gains" or "false profits" from Brent Seaman's Ponzi scheme that he operated through the Receivership Entities.

220. Brent Seaman caused Surge to make the Staub False Profit Transfers to Staub in furtherance and as part of the Ponzi scheme.

221. The Staub False Profit Transfers constituted payments of artificially high returns to an initial or insider investor from later investor monies with the goal of attracting more investors.

222. The Staub False Profit Transfers represent the amount of money Staub received from the Ponzi scheme in excess of the amount of money he invested in the Ponzi scheme.

223. Because the Ponzi scheme suffered investment losses and was funded by new investors, Staub provided no value to the Receivership Entities beyond his principal investments.

224. At all times when Brent Seaman caused Surge to make the Staub False Profit Transfers to Staub, the Receivership Entities were, or became as a result of the Staub False Profit Transfers to Staub:

a. in a financial position in which their debts were greater than all of their assets at fair valuation; and/or

b. generally not paying their debts as they became due.

225. At all times when Brent Seaman caused Surge to make the Staub False Profit Transfers to Staub, the Receivership Entities:

a. were engaged or were about to engaged in business or a transaction for which the remaining assets of the Receivership Entities were unreasonably same in relation to the business or transaction; or

b. intended to incur, or believed or reasonably should have believed that they would incur debts beyond their ability to pay as they became due.

226. As a direct and proximate result of the Staub False Profit Transfers, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $353,391.32 (the total amount of the “false profits” he received), and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate’s debts and liabilities, including, most notably, the claims of the investors

and/or creditors who were defrauded by Brent Seaman and the Receivership Entities.

227. The Receiver is suing to avoid and recover the Staub False Profit Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint, which is within the time period proscribed by section 726.110 of FUFTA.

228. The Staub False Profit Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint are avoidable and recoverable by the Receiver under FUFTA, specifically, sections 726.105(1)(b), 108(1), 109(2).

WHEREFORE, the Receiver respectfully requests the Court enter a judgment in the Receiver's favor against Theodore L. Staub, III:

A. Avoiding the Staub False Profit Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as constructive fraudulent transfers under sections 726.105(1)(b), 726.106(1) of FUFTA;

B. Awarding a money judgment in the amount of the Staub False Profit Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint under section 726.109(2) of FUFTA;

C. If necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to the Staub False Profit Transfers in the amount of the Staub False Profit Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint under section 726.108(1) of FUFTA;

D. Awarding pre-judgment interest on the amount of the Staub False Profit Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as provided by applicable law;

E. Awarding post-judgment interest on the amount of the Staub False Profit Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as provided by applicable law;

F. Awarding costs as provided by applicable law; and

G. Granting any other relief that is available under applicable law that the circumstances may require.

## ***ALTERNATIVE*** **COUNT III—UNJUST ENRICHMENT**

***(Receiver v. Staub)***

229. The Receiver sues Theodore L. Staub, III and adopts, realleges, and incorporates paragraphs 1 through 108 into *Alternative* Count III.

230. Surge, one of the Receivership Entities, conferred a direct benefit upon Staub through the Staub False Profit Transfers.

231. Staub had knowledge of the benefit he received from Surge as a result of the Staub False Profit Transfers that resulted in the "false profits" or "net gain".

232. Staub voluntarily accepted and retained the benefit of the Staub False Profit Transfers.

233. The Staub Profit Transfers were made with investor funds.

234. Staub is a "net winner" by virtue of his receipt of the Staub False Profit Transfers.

235. Staub did not provide reasonably equivalent consideration to the Receivership Entities or their investors given that the Staub False Profit Transfers were made in connection with and in furtherance of Brent Seaman and the Receivership Entities' unlawful and fraudulent scheme and provided zero benefit the Receivership Entities or their investors.

236. Brent Seaman caused Surge to make the Staub False Profit Transfers to Staub as part of his Ponzi scheme.

237. The Staub False Profit Transfers removed assets from the Receivership Entities for an unauthorized purpose, and thus, injured the Receivership Entities, including Surge.

238. Staub received this benefit at the expense of the defrauded investors, most of whom did not receive back any of their investments, and the Receivership

Estate has been diminished by the Staub False Profit Transfers, which unjustly enriched Staub.

239. By receiving the Staub False Profit Transfers, Staub received distributions of funds from Brent Seaman's Ponzi scheme, and thereby received a portion of other investors commingled funds, pushing the Receiver Entities deeper into insolvency.

240. It is inherently unfair and inequitable and violative of fundamental principles of justice, equity, and good conscience that the "false profits" or "net gain" comprising the funds of investors defrauded in Brent Seaman and the Receivership Entities' fraudulent scheme are retained by and used to personally benefit Staub, who profited from Brent Seaman's and the Receivership Entities' fraud at the expense of the other investors who suffered significant losses, rather than being returned to the Receivership Estate for the benefit of all of the defrauded investors and creditors.

241. The circumstances are such that it would be inequitable for Staub to retain the Staub False Profit Transfers without paying for the value he received.

242. The circumstances are such that it would be inequitable for Staub to retain the Staub False Profit Transfers rather than return the funds to the Receivership Estate for the benefit of all of the defrauded investors whose funds

were commingled in accounts from which the Staub False Profit Transfers were made to Staub.

243. As a direct and proximate result of the Staub False Profit Transfers, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $353,391.32 (the total amount of the "false profits" he received), and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by Brent Seaman and the Receivership Entities.

244. Applicable laws and principles of equity dictate that Staub must return to the Receiver for the benefit of the Receivership Estate and all defrauded investors the Staub False Profit Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint.

WHEREFORE, the Receiver respectfully requests the Court enter a judgment in the Receiver's favor against Theodore L. Staub, III:

A. Awarding a money judgment under the Florida common law doctrine of unjust enrichment in the amount of the Staub False Profit Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint;

B. If necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to the Staub False Profit Transfers in the amount of the Staub False Profit Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint;

C. Awarding pre-judgment interest on the amount of the Staub False Profit Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as provided by applicable law;

D. Awarding post-judgment interest on the amount of the Staub False Profit Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as provided by applicable law;

E. Awarding costs as provided by applicable law; and

F. Granting any other relief that is available under applicable law that the circumstances may require.

**COUNT IV – ACTUAL FRAUDULENT TRANSFERS**
**PURSUANT TO FLA. STAT. §§ 726.105(1)(A), 108(1), 109(2)**

***(Receiver v. Denease)***

245. The Receiver sues Angela D. Denease and adopts, realleges, and incorporates paragraphs 1 through 89 and 109 through 142 into Count IV.

246. As detailed above, the Receiver has standing to avoid and recover under FUFTA the Denease Transfers Brent Seaman caused the Surge to make to Denease.

247. Brent Seaman caused Surge to make the Denease Transfers to Denease in continuing breach of his fiduciary duty to Surge and as part of his adverse domination and control of Surge, which constituted torts against Surge.

248. Brent Seaman caused Surge to make the Denease Transfers to Denease in furtherance and as part of the Ponzi scheme.

249. With each of the Denease Transfers, Brent Seaman diverted Surge's funds, which he controlled and that could have been applicable to Surge's debts due.

250. The Denease Transfers constituted payments of investors' funds.

251. The Denease Transfers represent the amount of money Denease improperly received from the Ponzi scheme.

252. Because the Ponzi scheme suffered investment losses and was funded by new investors, there were no legitimate funds Brent Seaman could cause Surge to pay to Denease and Denease provided no value to the Receivership Entities in exchange for the Denease Transfers.

253. Brent Seaman caused Surge to make the Denease Transfers to Denease with the actual intent to hinder, delay, or defraud creditors.

254. The actual intent to hinder, delay, or defraud a creditor is demonstrated by the presence of, including, but not limited to, the following "badges of fraud" under section 726.105(2) of FUFTA:

a. Brent Seaman caused Surge to make the Denease Transfers to Denease, who is an insider (Brent Seaman's ex-wife);

b. the Denease Transfers were concealed;

c. Denease provided no value in exchange for the Denease Transfers;

d. Brent Seaman caused Surge to make the Denease Transfers to Denease while the Receivership Entities were insolvent; and

e. Brent Seaman caused Surge to make the Denease Transfers to Denease while the Receivership Entities were incurring substantial debt by accepting to new investors into the Ponzi scheme.

255. At all times when Brent Seaman caused Surge to make the Denease Transfers to Denease, the Receivership Entities were:

a. in a financial position in which their debts were greater than all of their assets at fair valuation; and/or;

b. generally not paying their debts as they became due.

256. The Denease Transfers constituted transfers of the Ponzi scheme investors' money to Denease.

257. As a direct and proximate result of the Denease Transfers, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $341,063.65 (the total amount of the improper payments she received), and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by Brent Seaman and the Receivership Entities.

258. The Receiver is suing to avoid and recover the Denease Transfers within one year of the date upon which she was appointed (October 27, 2023), which is within the time period proscribed by section 726.110 of FUFTA.

259. The Denease Transfers are avoidable and recoverable by the Receiver under FUFTA, including sections 726.105(1)(a), 108(1), and 109(2).

WHEREFORE, the Receiver respectfully requests the Court enter a judgment in the Receiver's favor against Angela D. Denease:

A. Avoiding the Denease Transfers as actual fraudulent transfers under sections 726.105(1)(a), 108(1) of FUFTA;

B. Awarding a money judgment in the amount of the Denease Transfers under section 726.109(2) of FUFTA;

C. If necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to the Denease Transfers in the amount of the Denease Transfers under section 726.108(1) of FUFTA;

D. Awarding pre-judgment interest on the amount of the Denease Transfers as provided by applicable law;

E. Awarding post-judgment interest on the amount of the Denease Transfers as provided by applicable law;

F. Awarding costs as provided by applicable law; and

G. Granting any other relief that is available under applicable law that the circumstances may require.

**COUNT V—CONSTRUCTIVE FRAUDULENT TRANSFERS PURSUANT TO FLA. STAT. §§ 726.105(1)(B), 726.106(1), 108(1), 109(2)**

***(Receiver v. Denease)***

260. The Receiver sues Angela D. Denease and adopts, realleges, and incorporates paragraphs 1 through 89 and 109 through 142 into Count V.

261. As detailed above, the Receiver has standing to avoid and recover under FUFTA the Denease Transfers Brent Seaman caused the Surge to make to Denease.

262. Brent Seaman caused Surge to make the Denease Transfers to Denease in continuing breach of his fiduciary duty to Surge and as part of his adverse domination and control of Surge, which constituted torts against Surge.

263. Brent Seaman caused Surge to make the Denease Transfers to Denease Seaman in furtherance and as part of the Ponzi scheme.

264. Because the Ponzi scheme suffered investment losses and was funded by new investors, there were no legitimate funds Brent Seaman could cause Surge to pay to Denease and Denease provided no value, let alone reasonably equivalent value, to the Receivership Entities in exchange for the Denease Transfers.

265. At all times when Brent Seaman caused Surge to make the Denease Transfers to Denease, the Receivership Entities were, or became as a result of the Denease Transfers to Denease:

a. in a financial position in which their debts were greater than all of their assets at fair valuation; and/or

b. generally not paying their debts as they became due.

266. At all times when Brent Seaman caused Surge to make the Denease Transfers to Denease, the Receivership Entities:

a. were engaged or were about to engaged in business or a transaction for which the remaining assets of the Receivership Entities were unreasonably same in relation to the business or transaction; or

b. intended to incur, or believed or reasonably should have believed that they would incur debts beyond their ability to pay as they became due.

267. As a direct and proximate result of the Denease Transfers, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $341,063.65 (the total amount of the improper payments she received), and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by Brent Seaman and the Receivership Entities.

268. The Receiver is suing to avoid and recover the Denease Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint, which is within the time period proscribed by section 726.110 of FUFTA.

269. The Denease Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint are avoidable and recoverable by the Receiver under FUFTA, specifically, sections 726.105(1)(b), 108(1), 109(2).

WHEREFORE, the Receiver respectfully requests the Court enter a judgment in the Receiver's favor against Angela D. Denease:

A. Avoiding the Denease Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as constructive fraudulent transfers under sections 726.105(1)(b), 726.106(1), 108(1) of FUFTA;

B. Awarding a money judgment in the amount of the Denease Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint under section 726.109(2) of FUFTA;

C. If necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to the Denease Transfers in the amount of the Denease Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint under section 726.108(1) of FUFTA;

D. Awarding pre-judgment interest on the amount of the Denease Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as provided by applicable law;

E. Awarding post-judgment interest on the amount of the Denease Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as provided by applicable law;

F. Awarding costs as provided by applicable law; and

G. Granting any other relief that is available under applicable law that the circumstances may require.

## *ALTERNATIVE* COUNT VI—UNJUST ENRICHMENT

**(*Receiver v. Denease*)**

270. The Receiver sues Angela D. Denease and adopts, realleges, and incorporates paragraphs through 1 through 89 and 109 through 142 into *Alternative* Count VI.

271. Surge, one of the Receivership Entities, conferred a direct benefit upon Denease through the Denease Transfers.

272. Denease had knowledge of the benefit she received from Surge as a result of the Denease Transfers that resulted in the improper payments.

273. Denease voluntarily accepted and retained the benefit of the Denease Transfers.

274. The Denease Transfers were made with investor funds.

275. Denease did not provide reasonably equivalent consideration to the Receivership Entities or their investors given that the Denease Transfers were made in connection with and in furtherance of Brent Seaman and the Receivership Entities' unlawful and fraudulent scheme and provided zero benefit the Receivership Entities or their investors.

276. Brent Seaman caused Surge to make the Denease Transfers to Denease as part of his Ponzi scheme.

277. The Denease Transfers removed assets from the Receivership Entities for an unauthorized purpose, and thus, injured the Receivership Entities, including Surge.

278. Denease received this benefit at the expense of the defrauded investors, most of whom did not receive back any of their investments, and the Receivership Estate has been diminished by the Denease Transfers, which unjustly enriched Denease.

279. By receiving the Denease Transfers, Denease received distributions of funds from Brent Seaman's Ponzi scheme, and thereby received a portion of other investors commingled funds, pushing the Receiver Entities deeper into insolvency.

280. It is inherently unfair and inequitable and violative of fundamental principles of justice, equity, and good conscience that the improper payments comprising the funds of investors defrauded in Brent Seaman and the Receivership Entities' fraudulent scheme are retained by and used to personally benefit Denease, who profited from Brent Seaman's and the Receivership Entities' fraud at the expense of the other investors who suffered significant losses, rather than being returned to the Receivership Estate for the benefit of all of the defrauded investors and creditors.

281. The circumstances are such that it would be inequitable for Denease to retain the Denease Transfers without paying for the value she received.

282. The circumstances are such that it would be inequitable for Denease to retain the Denease Transfers rather than return the funds to the Receivership Estate for the benefit of all of the defrauded investors whose funds were commingled in accounts from which the S Denease Transfers were made to Denease.

283. As a direct and proximate result of the Denease Transfers, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $341,063.65 (the total amount of the improper payments she received), and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by Brent Seaman and the Receivership Entities.

284. Applicable laws and principles of equity dictate that Denease must return to the Receiver for the benefit of the Receivership Estate and all defrauded investors the Denease Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint.

WHEREFORE, the Receiver respectfully requests the Court enter a judgment in the Receiver's favor against Angela D. Denease:

A. Awarding a money judgment in the amount of the Denease Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint under the Florida common law doctrine of unjust enrichment;

B. If necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to the Denease Transfers in the amount of the Denease Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint;

C. Awarding pre-judgment interest on the amount of Denease Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as provided by applicable law;

D. Awarding post-judgment interest on the amount of Denease Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as provided by applicable law;

E. Awarding costs as provided by applicable law; and

F. Granting any other relief that is available under applicable law that the circumstances may require.

**COUNT VII — ACTUAL FRAUDULENT TRANSFERS**
**PURSUANT TO FLA. STAT. §§ 726.105(1)(A), 108(1), 109(2)**

***(Receiver v. Lawhon)***

285. The Receiver sues Lawhon and adopts, realleges, and incorporates paragraphs 1 through 89 and 143 through 163 into Count VII.

286. As detailed above, the Receiver has standing to avoid and recover under FUFTA the Lawhon Transfers Brent Seaman caused the Surge to make to Lawhon.

287. Brent Seaman caused Surge to make the Lawhon Transfers to Lawhon in continuing breach of his fiduciary duty to Surge and as part of his adverse domination and control of Surge, which constituted torts against Surge.

288. Brent Seaman caused Surge to make the Lawhon Transfers to Lawhon in furtherance and as part of the Ponzi scheme.

289. With each of the Lawhon Transfers, Brent Seaman diverted Surge's funds, which he controlled and that could have been applicable to Surge's debts due.

290. The Lawhon Transfers constituted payments of investors' funds.

291. The Lawhon Transfers represent the amount of money Lawhon improperly received from the Ponzi scheme.

292. Because the Ponzi scheme suffered investment losses and was funded by new investors, there were no legitimate funds Brent Seaman could cause Surge to pay to Lawhon and Lawhon provided no value to the Receivership Entities in exchange for the Lawhon Transfers.

293. Brent Seaman caused Surge to make the Lawhon Transfers to Lawhon with the actual intent to hinder, delay, or defraud creditors.

294. The actual intent to hinder, delay, or defraud a creditor is demonstrated by the presence of, including, but not limited to, the following "badges of fraud" under section 726.105(2) of FUFTA:

a. Brent Seaman caused Surge to make the Lawhon Transfers to Lawhon, who is an insider (Brent Seaman's personal attorney's law firm);

b. the Lawhon Transfers were concealed;

c. Lawhon provided no value in exchange for the Lawhon Transfers;

d. Brent Seaman caused Surge to make the Lawhon Transfers to Lawhon while the Receivership Entities were insolvent; and

e. Brent Seaman caused Surge to make the Lawhon Transfers to Lawhon while the Receivership Entities were incurring substantial debt by accepting to new investors into the Ponzi scheme.

295. At all times when Brent Seaman caused Surge to make the Lawhon Transfers to Lawhon, the Receivership Entities were:

a. in a financial position in which their debts were greater than all of their assets at fair valuation; and/or;

b. generally not paying their debts as they became due.

296. The Lawhon Transfers constituted transfers of the Ponzi scheme investors' money to Lawhon.

297. As a direct and proximate result of the Lawhon Transfers, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $44,500.00 (the total amount of the improper payments it received), and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by Brent Seaman and the Receivership Entities.

298. The Receiver is suing to avoid and recover the Lawhon Transfers within one year of the date upon which she was appointed (October 27, 2023), which is within the time period proscribed by section 726.110 of FUFTA.

299. The Lawhon Transfers are avoidable and recoverable by the Receiver under FUFTA, including sections 726.105(1)(a), 108(1), and 109(2).

WHEREFORE, the Receiver respectfully requests the Court enter a judgment in the Receiver's favor against Lawhon:

A. Avoiding the Lawhon Transfers as actual fraudulent transfers under section 726.105(1)(a) of FUFTA;

B. Awarding a money judgment in the amount of the Lawhon Transfers under section 726.109(2) of FUFTA;

C. If necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to the Lawhon Transfers in the amount of the Lawhon under section 726.108(1) of FUFTA;

D. Awarding pre-judgment interest on the Lawhon Transfers as provided for by applicable law;

E. Awarding post-judgment interest on the Lawhon Transfers as provided for by applicable law;

F. Awarding costs as provided for by applicable law; and

G. Granting any other relief that is available under applicable law that the circumstances may require.

## COUNT VIII—CONSTRUCTIVE FRAUDULENT TRANSFERS PURSUANT TO FLA. STAT. §§ 726.105(1)(B), 726.106(1), 108(1), 109(2)

***(Receiver v. Lawhon)***

300. The Receiver sues Lawhon and adopts, realleges, and incorporates paragraphs 1 through 89 and 143 through 163 into Count VIII.

301. As detailed above, the Receiver has standing to avoid and recover under FUFTA the Lawhon Transfers Brent Seaman caused the Surge to make to Lawhon.

302. Brent Seaman caused Surge to make the Lawhon Transfers to Lawhon in continuing breach of his fiduciary duty to Surge and as part of his adverse domination and control of Surge, which constituted torts against Surge.

303. Brent Seaman caused Surge to make the Lawhon Transfers to Lawhon in furtherance and as part of the Ponzi scheme.

304. Because the Ponzi scheme suffered investment losses and was funded by new investors, there were no legitimate funds Brent Seaman could cause Surge to pay to Lawhon and Lawhon provided no value, let alone reasonably equivalent value, to the Receivership Entities in exchange for the Lawhon Transfers.

305. At all times when Brent Seaman caused Surge to make the Lawhon Transfers to Lawhon, the Receivership Entities were, or became as a result of the Lawhon Transfers to Lawhon:

a. in a financial position in which their debts were greater than all of their assets at fair valuation; and/or

b. generally not paying their debts as they became due.

306. At all times when Brent Seaman caused Surge to make the Lawhon Transfers to Lawhon, the Receivership Entities:

a. were engaged or were about to engaged in business or a transaction for which the remaining assets of the Receivership Entities were unreasonably same in relation to the business or transaction; or

b. intended to incur, or believed or reasonably should have believed that they would incur debts beyond their ability to pay as they became due.

307. As a direct and proximate result of the Lawhon Transfers, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $44,500 (the total amount of the improper payments it received), and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by Brent Seaman and the Receivership Entities.

308. The Receiver is suing to avoid and recover the Lawhon Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint, which is within the time period proscribed by section 726.110 of FUFTA.

309. The Lawhon Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint are avoidable and recoverable by the Receiver under FUFTA, specifically, sections 726.105(1)(b), 108(1), 109(2).

WHEREFORE, the Receiver respectfully requests the Court enter a judgment in the Receiver's favor against Lawhon:

A. Avoiding the Lawhon Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as constructive fraudulent transfers under sections 726.105(1)(b), 726.106(1), 108(1) of FUFTA;

B. Awarding a money judgment in the amount of the Lawhon Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint under section 726.109(2) of FUFTA;

C. If necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to the Lawhon Transfers in the amount of the Lawhon Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint under section 726.108(1) of FUFTA;

D. Awarding pre-judgment interest on the amount of the Lawhon Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as provided by applicable law;

E. Awarding post-judgment interest on the amount of the Lawhon Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as provided by applicable law;

F. Awarding costs as provided by applicable law; and

G. Granting any other relief that is available under applicable law that the circumstances may require.

## *ALTERNATIVE* COUNT IX—UNJUST ENRICHMENT

**(*Receiver v. Lawhon*)**

310. The Receiver sues Lawhon and adopts, realleges, and incorporates paragraphs 1 through 89 and 143 through 163 into *Alternative* Count IX.

311. Surge, one of the Receivership Entities, conferred a direct benefit upon Lawhon through the Lawhon Transfers.

312. Lawhon had knowledge of the benefit he received from Surge as a result of the Lawhon Transfers that resulted in the improper payments.

313. Lawhon voluntarily accepted and retained the benefit of the Lawhon Transfers.

314. The Lawhon Transfers were made with investor funds.

315. Lawhon did not provide reasonably equivalent consideration to the Receivership Entities or their investors given that the Lawhon Transfers were made in connection with and in furtherance of Brent Seaman and the Receivership Entities' unlawful and fraudulent scheme and provided zero benefit the Receivership Entities or their investors.

316. Brent Seaman caused Surge to make the Lawhon Transfers to Lawhon as part of his Ponzi scheme.

317. The Lawhon Transfers removed assets from the Receivership Entities for an unauthorized purpose, and thus, injured the Receivership Entities, including Surge.

318. Lawhon received this benefit at the expense of the defrauded investors, most of whom did not receive back any of their investments, and the Receivership Estate has been diminished by the Lawhon Transfers, which unjustly enriched Lawhon.

319. By receiving the Lawhon Transfers, Lawhon received distributions of funds from Brent Seaman's Ponzi scheme, and thereby received a portion of other investors commingled funds, pushing the Receiver Entities deeper into insolvency.

320. It is inherently unfair and inequitable and violative of fundamental principles of justice, equity, and good conscience that the improper payments comprising the funds of investors defrauded in Brent Seaman and the Receivership Entities' fraudulent scheme are retained by and used to personally benefit Lawhon, which profited from Brent Seaman's and the Receivership Entities' fraud at the expense of the other investors who suffered significant losses,

rather than being returned to the Receivership Estate for the benefit of all of the defrauded investors and creditors.

321. The circumstances are such that it would be inequitable for Lawhon to retain the Lawhon Transfers without paying for the value it received.

322. The circumstances are such that it would be inequitable for Lawhon to retain the Lawhon Transfers rather than return the funds to the Receivership Estate for the benefit of all of the defrauded investors whose funds were commingled in accounts from which the Lawhon Transfers were made to Lawhon.

323. As a direct and proximate result of the Lawhon Transfers, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $44,500.00 (the total amount of the improper payments it received), and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by Brent Seaman and the Receivership Entities.

324. Applicable laws and principles of equity dictate that Lawhon must return to the Receiver for the benefit of the Receivership Estate and all defrauded investors the Montgomery Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint.

WHEREFORE, the Receiver respectfully requests the Court enter a judgment in the Receiver's favor against Lawhon:

A. Awarding a money judgment in the amount of the Lawhon Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint under the Florida common law doctrine of unjust enrichment;

B. If necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to the Montgomery Transfers in the amount of the Lawhon Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint;

C. Awarding pre-judgment interest on the amount of Lawhon Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as provided for by applicable law;

D. Awarding post-judgment interest on the amount of Lawhon Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as provided for by applicable law;

E. Awarding costs as provided by applicable law; and

F. Granting any other relief that is available under applicable law that the circumstances may require.

**COUNT X—ACTUAL FRAUDULENT TRANSFERS**
**PURSUANT TO FLA. STAT. §§ 726.105(1)(A), 108(1), 109(2)**

**(*Receiver v. Montgomery*)**

325. The Receiver sues Montgomery Street Realty, LLC and adopts, realleges, and incorporates paragraphs 1 through 89 and 164 through 200 into Count X.

326. As detailed above, the Receiver has standing to avoid and recover under FUFTA the Montgomery Transfers Brent Seaman caused the Surge to make to Montgomery.

327. Brent Seaman caused Surge to make the Montgomery Transfers to Montgomery in continuing breach of his fiduciary duty to Surge and as part of his adverse domination and control of Surge, which constituted torts against Surge.

328. Brent Seaman caused Surge to make the Montgomery Transfers to Montgomery in furtherance and as part of the Ponzi scheme.

329. With each of the Montgomery Transfers, Brent Seaman diverted Surge's funds, which he controlled and that could have been applicable to Surge's debts due.

330. The Montgomery Transfers constituted payments of investors' funds.

331. The Montgomery Transfers represent the amount of money Montgomery improperly received from the Ponzi scheme.

332. Because the Ponzi scheme suffered investment losses and was funded by new investors, there were no legitimate funds Brent Seaman could cause Surge to pay to Montgomery and Montgomery provided no value to the Receivership Entities in exchange for the Montgomery Transfers.

333. Brent Seaman caused Surge to make the Montgomery Transfers to Montgomery with the actual intent to hinder, delay, or defraud creditors.

334. The actual intent to hinder, delay, or defraud a creditor is demonstrated by the presence of, including, but not limited to, the following "badges of fraud" under section 726.105(2) of FUFTA:

a. the Montgomery Transfers were concealed;

b. Montgomery provided no value in exchange for the Montgomery Transfers;

c. Brent Seaman caused Surge to make the Montgomery Transfers to Montgomery while the Receivership Entities were insolvent; and

d. Brent Seaman caused Surge to make the Montgomery Transfers to Montgomery while the Receivership Entities were incurring substantial debt by accepting to new investors into the Ponzi scheme.

335. At all times when Brent Seaman caused Surge to make the Montgomery Transfers to Montgomery, the Receivership Entities were:

a. in a financial position in which their debts were greater than all of their assets at fair valuation; and/or;

b. generally not paying their debts as they became due.

336. The Montgomery Transfers constituted transfers of the Ponzi scheme investors' money to Montgomery.

337. As a direct and proximate result of the Montgomery Transfers, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $445,334.00 (the total amount of the improper payments it received), and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by Brent Seaman and the Receivership Entities.

338. The Receiver is suing to avoid and recover the Montgomery Transfers within one year of the date upon which she was appointed (October 27, 2023), which is within the time period proscribed by section 726.110 of FUFTA.

339. The Montgomery Transfers are avoidable and recoverable by the Receiver under FUFTA, including sections 726.105(1)(a), 108(1), and 109(2).

WHEREFORE, the Receiver respectfully requests the Court enter a judgment in the Receiver's favor against Montgomery:

A. Avoiding the Montgomery Transfers as actual fraudulent transfers under sections 726.105(1)(a), 726.108(1) of FUFTA;

B. Awarding a money judgment in the amount of the Montgomery Transfers under section 726.109(2) of FUFTA;

C. If necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to the Montgomery Transfers in the amount of the Montgomery Transfers under section 726.108(1) of FUFTA;

D. Awarding pre-judgment interest on the amount of Montgomery Transfers as provided for by applicable law;

E. Awarding post-judgment interest on the amount of Montgomery Transfers as provided by applicable law;

F. Awarding costs as provided by applicable law; and

G. Granting any other relief that is available under applicable law that the circumstances may require.

**COUNT XI—CONSTRUCTIVE FRAUDULENT TRANSFERS PURSUANT TO FLA. STAT. §§ 726.105(1)(B), 726.106(1), 108(1), 109(2)**

**(*Receiver v. Montgomery)***

340. The Receiver sues Montgomery and adopts, realleges, and incorporates paragraphs 1 through 89 and 164 through 200 into Count XI.

341. As detailed above, the Receiver has standing to avoid and recover under FUFTA the Montgomery Transfers Brent Seaman caused the Surge to make to Montgomery.

342. Brent Seaman caused Surge to make the Montgomery Transfers to Lawhon in continuing breach of his fiduciary duty to Surge and as part of his adverse domination and control of Surge, which constituted torts against Surge.

343. Brent Seaman caused Surge to make the Montgomery Transfers to Montgomery in furtherance and as part of the Ponzi scheme.

344. Because the Ponzi scheme suffered investment losses and was funded by new investors, there were no legitimate funds Brent Seaman could cause Surge to pay to Montgomery and Montgomery provided no value, let alone reasonably equivalent value, to the Receivership Entities in exchange for the Montgomery Transfers.

345. At all times when Brent Seaman caused Surge to make the Montgomery Transfers to Montgomery, the Receivership Entities were, or became as a result of the Montgomery Transfers to Montgomery:

a. in a financial position in which their debts were greater than all of their assets at fair valuation; and/or

b. generally not paying their debts as they became due.

346. At all times when Brent Seaman caused Surge to make the Montgomery Transfers to Montgomery, the Receivership Entities:

a. were engaged or were about to engaged in business or a transaction for which the remaining assets of the Receivership Entities were unreasonably same in relation to the business or transaction; or

b. intended to incur, or believed or reasonably should have believed that they would incur debts beyond their ability to pay as they became due.

347. As a direct and proximate result of the Montgomery Transfers, the Receivership Estate has been damaged or otherwise diminished in the amount of at least 445,334.00 (the total amount of the improper payments it received), and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by Brent Seaman and the Receivership Entities.

348. The Receiver is suing to avoid and recover the Montgomery Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint, which is within the time period proscribed by section 726.110 of FUFTA.

349. The Montgomery Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint are avoidable and recoverable by the Receiver under FUFTA, specifically, sections 726.105(1)(b), 108(1), 109(2).

WHEREFORE, the Receiver respectfully requests the Court enter a judgment in the Receiver's favor against Montgomery:

A. Avoiding the Montgomery Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as constructive fraudulent transfers under sections 726.105(1)(b), 726.106(1), 726.108(1) of FUFTA;

B. Awarding a money judgment in the amount of the Montgomery Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint under section 726.109(2) of FUFTA;

C. If necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to the Montgomery Transfers in the amount of the Montgomery Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint under section 726.108(1) of FUFTA;

D. Awarding pre-judgment interest on the Montgomery Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as provided for by applicable law;

E. Awarding post-judgment interest on the Montgomery Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as provided for by applicable law;

F. Awarding costs as provided by applicable law; and

G. Granting any other relief that is available under applicable law that the circumstances may require.

**_*ALTERNATIVE*_ COUNT XII—UNJUST ENRICHMENT**

**(*Receiver v. Montgomery*)**

350. The Receiver sues Montgomery Street Realty, LLC and adopts, realleges, and incorporates paragraphs 1 through 89 and 164 through 200 into *Alternative* Count XII.

351. Surge, one of the Receivership Entities, conferred a direct benefit upon Montgomery through the Montgomery Transfers.

352. Montgomery had knowledge of the benefit he received from Surge as a result of the Montgomery Transfers that resulted in the improper payments.

353. Montgomery voluntarily accepted and retained the benefit of the Montgomery Transfers.

354. The Montgomery Transfers were made with investor funds.

355. Montgomery did not provide reasonably equivalent consideration to the Receivership Entities or their investors given that the Montgomery Transfers were made in connection with and in furtherance of Brent Seaman and the Receivership Entities' unlawful and fraudulent scheme and provided zero benefit the Receivership Entities or their investors.

356. Brent Seaman caused Surge to make the Montgomery Transfers to Montgomery as part of his Ponzi scheme.

357. The Montgomery Transfers removed assets from the Receivership Entities for an unauthorized purpose, and thus, injured the Receivership Entities, including Surge.

358. Montgomery received this benefit at the expense of the defrauded investors, most of whom did not receive back any of their investments, and the Receivership Estate has been diminished by the Montgomery Transfers, which unjustly enriched Montgomery.

359. By receiving the Montgomery Transfers, Montgomery received distributions of funds from Brent Seaman's Ponzi scheme, and thereby received a portion of other investors commingled funds, pushing the Receiver Entities deeper into insolvency.

360. It is inherently unfair and inequitable and violative of fundamental principles of justice, equity, and good conscience that the improper payments comprising the funds of investors defrauded in Brent Seaman and the Receivership Entities' fraudulent scheme are retained by and used to personally benefit Montgomery, which profited from Brent Seaman's and the Receivership Entities' fraud at the expense of the other investors who suffered significant losses, rather than being returned to the Receivership Estate for the benefit of all of the defrauded investors and creditors.

361. The circumstances are such that it would be inequitable for Montgomery to retain the Montgomery Transfers without paying for the value it received.

362. The circumstances are such that it would be inequitable for Montgomery to retain the Montgomery Transfers rather than return the funds to the Receivership Estate for the benefit of all of the defrauded investors whose funds were commingled in accounts from which the Montgomery Transfers were made to Montgomery.

363. As a direct and proximate result of the Montgomery Transfers, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $445,334.00 (the total amount of the improper payments it received), and the remaining assets of the Receivership Estate are insufficient to pay the

Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by Brent Seaman and the Receivership Entities.

364. Applicable laws and principles of equity dictate that Montgomery must return to the Receiver for the benefit of the Receivership Estate and all defrauded investors the Montgomery Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint.

WHEREFORE, the Receiver respectfully requests the Court enter a judgment in the Receiver's favor against Montgomery:

A. Awarding a money judgment in the amount of the Montgomery Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint under the Florida common law doctrine of unjust enrichment;

B. If necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to the Montgomery Transfers in the amount of the Montgomery Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint;

C. Awarding pre-judgment interest on the amount of Montgomery Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as provided for by applicable law;

D. Awarding post-judgment interest on the amount of Montgomery Transfers that were made within the four-year period prior to the date the Receiver filed the Complaint as provided for by applicable law;

E. Awarding costs as provided by applicable law; and

F. Granting any other relief that is available under applicable law that the circumstances may require.

Dated: October 25, 2024

/s/ *Kristopher E. Pearson*
Kristopher E. Pearson (Lead Counsel)
Florida Bar Number 16874
Kenneth Dante Murena, Esq.
Fla. Bar Number 147486
kpearson@dvcattorneys.com
kmurena@dvllp.com
DAMIAN | VALORI | CULMO
1000 Brickell Avenue, Suite 1020
Miami, FL 33131
Telephone: (305) 371-3960